

IN THE
UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| YALE UNIVERSITY, <br>     Plaintiff, | ) ) ) ) | |
| v. | ) ) | Court No. 95-09-01136 |
| UNITED STATES, <br>     Defendant. | ) ) ) ) | |

**COMPLAINT**

Jurisdiction

1. This Court has jurisdiction over the claims herein under 28 U.S.C. §1581(a).

2. This Court has authority pursuant to 28 U.S.C. §2643 to issue the relief sought herein.

The Parties

3. Plaintiff Yale University ("Plaintiff") is a specially-chartered Connecticut non-stock corporation located in New Haven, Connecticut and the importer of the merchandise at issue.

4. Defendant United States ("Defendant") is responsible for the conduct and activities of the United States Customs Service ("Customs") and its agents.

Description of the Merchandise

5. The merchandise at issue, a shielded gradient coil system (the "Shielded Coil System"), was brought into the United States as Entry Number CO4-0016082-3 on September 12, 1991.

6. The Shielded Coil System consists of two power supplies -- a gradient power unit and a shim power unit -- and an active shielded gradient coil. The Shielded Coil System was designed and intended to improve the performance of an existing nuclear magnetic resonance spectrometer/imager (the "NMR Spectrometer") which plaintiff purchased and brought into the United States on a duty-free basis under Tariff Schedule of the United States ("TSUS") Item 851.60 (now subheading 9810.00.60 of the Harmonized Tariff Schedule of the United States ("HTSUS")).

7. A nuclear magnetic resonance ("NMR") spectrometer/imager consists of (i) a powerful doughnut-shaped superconducting electromagnet, including shim and gradient coils to direct and control the magnetic field, inside of which the organism or tissue being studied is placed; (ii) broadband radio frequency electronics and associated radio frequency coils inside the electromagnet, through which selected radio frequencies are emitted and focused on a particular portion of the tissue or organism and their reflection from the tissue or organism measured; and (iii) a computer with specialized hardware and software that uses advanced computational techniques to disaggregate the radio frequency response where the tissue or organism contains numerous chemical substances and to calibrate the radio frequency response of a particular substance to different frequency levels, and that analyzes the pattern of response, so disaggregated and calibrated, in order to pick out the "signature" response of various elements which are present.

### Contested Customs Decision

8. Plaintiff contests Customs' actions denying duty-free entry for the Shielded Coil System.

9. On July 9, 1991, Plaintiff filed an application (the "Shielded Coil Application") for duty-free entry of the Shielded Coil System under subheading

9810.00.60 HTSUS on the basis that it constituted a non-accompanying accessory for the NMR Spectrometer. A copy of the Shielded Coil Application is attached hereto as Exhibit 1.

10. On August 28, 1991, the Chief of the Special Classifications Branch of Customs denied the Shielded Coil Application. The denial asserted that the Shielded Coil System was a "component" rather than an "accessory." The denial also noted that the NMR Spectrometer in which the Shielded Coil System was to be installed had itself been denied duty free treatment under subheading 9810.00.60 HTSUS. Finally, the denial stated that "Components are not eligible for duty-free treatment under subheading 9810.00.60, HTSUS." It was not clear at the time whether this latter statement was intended as an absolute statement of the law as to the eligibility of "components" for duty-free treatment or merely as an application of the law to what the Branch Chief believed to be the facts of this particular case. A copy of the denial is attached hereto as Exhibit 2.

11. During the pendency of litigation before this Court over Customs' denial of duty-free entry for the NMR Spectrometer (the "NMR Spectrometer Litigation"), liquidation of Entry CO4-0016082-3 was suspended on several occasions by the Director of the Boston District Office of Customs at the request of Plaintiff pursuant to Customs regulation § 159.12, 19 C.F.R. § 159.12.

12. On November 18, 1994, following resolution of the NMR Spectrometer Liquidation on a basis favorable to Plaintiff, Entry CO4-0016082-3 was liquidated in the amount of $9,029.36, reflecting a duty of $8,723.71 calculated on the basis of the classification of the Shielded Coil System under subheading 9027.80.40103, HTSUS and other charges of $305.65. Copies of the Entry Summary and Notice of Liquidation are attached hereto as Exhibit 3.

13. On December 20, 1994, Plaintiff filed a Protest (the "Shielded Coil Protest") over the denial of its Request for Duty-Free Entry of Customs Entry No. CO4-

0016082-3.  The Shielded Coil Protest was received by the Office of the District
Director of Customs in Hartford, Connecticut, on December 22, 1994, and was
assigned number 0401-94-100756 by Customs.  A copy of the Protest is attached hereto
as Exhibit 4.

14.  On March 16, 1995, the Boston District Office of Customs, to which the
Shielded Coil Protest had been forwarded, denied the Shielded Coil Protest in full.
The denial noted that the merchandise in question had been determined to be a
"component" within the governing regulations and stated that components can
"never" be eligible for duty-free entry under subheading 9810.00.60, HTSUS.  A copy
of the denial is attached hereto as Exhibit 5.

### Related Customs Decision and NMR Spectrometer Litigation

15.  On January 16, 1986, Plaintiff filed an application for duty-free entry of the
NMR Spectrometer (the "NMR Application") on the basis that it constituted a
scientific instrument entered for the exclusive and noncommercial use of a
nonprofit institution established for scientific and educational purposes, and no
instrument of equivalent scientific value was being manufactured in the United
States.  Plaintiff maintained that the NMR Spectrometer was properly classified
under TSUS Item 851.60, and therefore was eligible for duty-free entry.

16.  On May 5, 1986 Customs approved the NMR Application, accepting it for
transmittal to the U.S. Department of Commerce under Docket No. 86-00204.

17.  In July 1987, Customs notified Plaintiff that it was revoking the earlier-
approved NMR Application.  In its letter, Customs stated that the NMR
Spectrometer was ineligible for duty-free entry under TSUS Item 851.60 because the
nature of the collaborative effort between Plaintiff and the vendor contravened 15
C.F.R. § 301.4(a)(3).

18. Plaintiff appealed the revocation of the NMR Application by letter dated August 6, 1987.

19. By letter dated March 4, 1988, Customs rejected Plaintiff's appeal, stating that the NMR Spectrometer was ineligible for duty-free entry under 15 C.F.R. §301.4(a)(3), because "there was considered to be a commercial aspect to the transaction, beyond a mere arm's length sale."

20. Customs erroneously classified the NMR Spectrometer under subheading 712.49, TSUS, and therefore unlawfully imposed a 5.5% rate of duty.

21. By letter dated January 10, 1989, Plaintiff filed a Protest (the "NMR Protest") of Customs' decision.  The NMR Protest was delivered to the U.S. Customs Office in Hartford, Connecticut on January 11, 1989, and assigned Protest No. 04119000001.

22. Customs denied the NMR Protest by letter dated January 14, 1991.

23. On July 11, 1991, Plaintiff filed a Summons in this Court commencing the NMR Spectrometer Litigation as a civil action, pursuant to 28 U.S.C. §1581(a), seeking redress from Customs' misclassification of the NMR Spectrometer and its denial of the NMR Protest.  This action was assigned Court No. 91-07-00492.

24. By letter dated February 2, 1993, Plaintiff was informed by the International Trade Field Office, Commercial Litigation Branch, of the Civil Division of the U.S. Department of Justice that Customs now agreed with Plaintiff's contention that collaboration between Plaintiff and the manufacturer of the NMR Spectrometer did not constitute commercial use and, therefore, did not preclude duty-free treatment if all of the other requirements for such treatment were satisfied.  A copy of that letter is attached hereto as Exhibit 6.

25. On May 5, 1993, Judge Jane Restani of this Court signed an order remanding the NMR Application to Customs with instructions to grant  duty-free treatment for the NMR Spectrometer if it was concluded that no instrument or

apparatus of equivalent scientific value was being manufactured in the United States.  A copy of that order is attached hereto as Exhibit 7.

26.  By letter dated April 26, 1994, this Court and the Plaintiff were informed by the International Trade Field Office, Commercial Litigation Branch, of the Civil Division of the U.S. Department of Justice that Customs had determined that the NMR Spectrometer was entitled to duty-free entry.  A copy of that letter is attached hereto as Exhibit 8.  On November 17, 1994, Plaintiff received six checks, dated November 8, 1994, in the aggregate amount of $46,910.17, representing a refund of all duties paid on the NMR Spectrometer plus interest.

### Protest and Payment of Duty

27.  The Shielded Coil Protest was timely filed on Customs Form 19 within 90 days of November 18, 1994, the date of liquidation of Entry CO4-0016082-3 under subheading 9027.80.40103, HTSUS.

28.  All liquidated duties were paid to the U.S. Customs Service in the amount of $9,029.36.

### Claim for Relief

29.  The University's Department of Molecular Biophysics and Biochemistry ("MB&B") provides instruction and conducts research concerning the molecular basis of biological processes.

30.  The MB&B Department uses NMR spectroscopy for studies of macromolecular structure and intermediary metabolism in vivo.  NMR spectroscopy involves the analysis of the pattern of energy released by organic material exposed to selected radio frequencies in the presence of an intense electromagnetic field.  Because each chemical element has a unique response pattern, it is possible using NMR spectroscopy to identify the chemical composition

of organic substances and to monitor chemical reactions within the substance as they occur.

31. With its original unshielded gradient coil in place, the Spectrometer was used by the MB&B Department in a program of calibration, research and experimentation designed to understand noninvasively the basic biochemistry of human metabolism. One series of investigations conducted with the Spectrometer began to shed light on the process by which glucose is digested and stored within the body. By studying the chemical chain reaction set in motion by the digestion of sugar through which the healthy body keeps it blood sugar level in balance, the MB&B faculty hoped to increase the understanding of persons suffering diabetes. Other studies conducted with the NMR Spectrometer were directed toward (i) gaining new information about the biochemistry of neurons and glia in gray and white brain matter in which the proportions of these cell types have been altered by dementia or multiple schlerosis, (ii) monitoring continuously in vivo the sequential alterations in the cellular concentration of adenine nucleotides, tissue pH, lactate, and rate of ATP utilization in the kidneys of patients with ischemic acute renal failure, renal transplant rejection, obstructive nephropathy and renal artery stenosis, and (iii) conducting pathophysiologic investigations of regional myocardial ischemia in vivo.

32. In NMR spectroscopy strong pulses of inhomogeneous magnetic fields produced by gradient coils are required to determine the region of tissue from which a resonance signal arises. Once a set of frequencies have been emitted, the gradient fields must be completely switched off prior to the acquisition of the return signal or the measurement will be distorted. The main limitation of the gradient coil system with which the NMR Spectrometer was originally equipped was that the time varying magnetic fields produced by the gradients induced eddy currents inside the magnets. These eddy currents caused disturbance in the field at the center of the

-7-

magnet which persisted after the gradients were switched off. The Shielded Coil System offered a 30 to 100 fold reduction in eddy currents allowing measurements to be made within 1 msec after gradient switch-off as opposed to the minimum 20 msec delay with the original gradient set.

33. The Shielded Coil System was required to enhance the performance of the NMR Spectrometer in order to permit the MB&B Department to perform the various experiments to be carried out under National Institute of Health grant # NIH P01 DK34576-05. The rapid switching off of the gradients is essential for accurately measuring signals from brain amino acids, liver glycogen and kidney phosphate compounds which have short resonance lifetimes and lose much of their signal intensity during the switch-off time of the the NMR Spectrometer as originally purchased and installed, which was greater than 20 msec. The NIH Grant is divided into a spectroscopy development section (Project I) and three medical application projects (Projects II through IV). Previous work in the areas covered by the NIH Grant had reached the limits of performance of a unshielded gradient system. The NIH Grant required measurement of liver glycogen, kidney osmolites and various metabolites (phenylalanine, glutamate and glucose), all of which have resonance lifetime of less than 20 msec.

## COUNT I

### (Improper Classification)

34. Plaintiff realleges and incorporates by reference each allegation set forth in paragraphs 1 through 32 hereof as if each allegation was set forth in full.

35. The Shielded Coil System satisfies the definition of an "accessory" under 15 C.F.R. § 301.2(h).

36. As required by 15 C.F.R. § 301.2(h), the Shielded Coil System "adds to the capability" of the NMR Spectrometer.

37. The definition of "accessory" in 15 C.F.R. § 301.2(h) anticipates that an "accessory" may either be "part of" an instrument or "an attachment to" an instrument. The fact that the Shielded Coil System is installed within the NMR Spectrometer is entirely consistent with its being "part of" the NMR Spectrometer and an "accessory" thereto.

38. In its letter denying the Shielded Coil Application, Customs cited the Webster's definition of an "accessory" as a piece of equipment "not essential in itself but adding to the convenience or effectiveness of something else." The Shielded Coil System satisfies this definition. Clearly, the MB&B Department was able to carry out and publish the results of some important work with the NMR Spectrometer in its original configuration. Just as clearly, that work had reached a point where additional results would require the additional measurement sensitivity afforded by the Shielded Coil System.

39. It is a truism that an NMR spectrometer/imager requires a gradient coil of some sort to function. However, there is no basis in the statute or relevant regulations for Customs' view that the Shielded Coil System must be a "component" solely because it contains a gradient coil. On a net basis, the substitution of the Shielded Coil System for the unshielded gradient coil originally installed in the NMR Spectrometer results in the addition of shielding around the magnet to protect it from the varying magnetic fields produced by the gradients. This clearly "adds to the capability of" the instrument.

40. Defendant's failure and refusal to classify the Shielded Coil System as an "accessory" is arbitrary, capricious and contrary to law.

### COUNT II

(Noncompliance with statutory and regulatory authority)

41. Plaintiff realleges and incorporates by reference each allegation set forth in paragraphs 1 through 40 hereof as if each allegation was set forth in full.

42.  Even assuming that the Shielded Coil is a "component" rather than an "accessory," Customs wrongly denied duty-free entry based on a faulty reading of the applicable regulations and/or an inaccurate factual predicate.

43.  In her letter of August 29, 1991, the Chief of the Special Classification Branch of Customs denied the Shielded Coil Application on the basis that "[c]omponents are not eligible for duty-free treatment under subheading 9810.00.60 HTSUS." In its denial of the Shielded Coil Protest, the Boston District Office stated that separately imported components can "never" be eligible for duty-free entry under subheading 9810.00.60 HTSUS.

44.  Subheading 9810.00.60 HTSUS provides duty-free treatment for "[i]nstruments and apparatus, if no instrument or apparatus of equivalent scientific value for the purposes for which the instrument or apparatus is intended to be used is being manufactured in the United States." This subheading makes reference to headnote #6 in which the term "instrument and apparatus" is defined for these purposes to include instruments and apparatus provided for and dutiable in Chapter 90 except for certain designated subheadings.  Within Chapter 90, heading 9027 includes "[i]nstruments and apparatus for physical or chemical analysis (for example, . . . spectrometers . . .); . . . parts and accessories thereof:" There follows a series of subheadings, including  9027.80.25 which consists of "nuclear magnetic resonance instruments."  The reference in heading 9027 to "parts <u>and</u> accessories thereof" suggests that at least some parts which are not accessories must be eligible for duty-free entry under subheading 9800.10.60.  But Customs' view that components are never eligible for duty-free entry would effectively restrict duty-free treatment to whole instruments and accessories and thereby rob the separate reference to "parts" in heading 9027 of any meaning.

45.  By its express terms, 15 CFR § 301.2(k) proscribes duty-free treatment for "components" only insofar as they are to be installed either in "instruments which

did not enter duty-free under tariff item 851.60" or in "instruments being manufactured or assembled by a commercial firm or entity in the United States." See 15 CFR § 301.2(k).

46. The NMR Spectrometer did enter duty-free under tariff item 851.60 or its successor provision in the HTSUS, and the NMR Spectrometer was not "manufactured or assembled by a commercial firm in the United States."

47. Consequently, even if the Shielded Coil System is a "component," nothing in 15 C.F.R. § 301.2(k) prevented the acceptance and consideration of the Shielded Coil Application.

48.     There is simply no basis in relevant statues or regulations for Custom's apparent view that components are automatically ineligible for duty-free treatment. Moreover, this view renders meaningless most of the language of § 301.2(k), as well as the separate reference to "parts" in heading 9027.

49. Custom's failure and refusal to consider the Shielded Coil System Application because of its belief that the Shielded Coil System is a "component" is arbitrary, capricious and contrary to law.

## COUNT III

(Noncompliance with statutory and regulatory authority) ·

50. Plaintiff realleges and incorporates by reference each allegation set forth in paragraphs 1 through 49 hereof as if each allegation was set forth in full.

51. Custom's failure and refusal to consider the Shielded Coil System Application because of its belief that the Shielded Coil System is a "component" was based on an erroneous and unjustified reading of the relevant regulations.


## Demand for Judgment

WHEREFORE, plaintiff demands that this Court:

## ON COUNT I

52.  Direct Customs to process the Shielded Coil Application and grant the Shielded Coil System duty-free treatment should it be determined that an equivalent domestic instrument was not available.

53.  Provide such other relief as the Court deems just and proper.

## ON COUNT II

54.  Direct Customs to process the Shielded Coil Application and grant the Shielded Coil System duty-free treatment should it be determined that an equivalent domestic instrument was not available.

55.  Provide such other relief as the Court deems just and proper.

## ON COUNT III

56.  Direct Customs to process the Shielded Coil Application and grant the Shielded Coil System duty-free treatment should it be determined that an equivalent domestic instrument was not available.

57.  Provide such other relief as the Court deems just and proper.

YALE UNIVERSITY

By _____

Kenneth R. Miller
Yale University
Office of the General Counsel
P.O. Box 208255.
New Haven, Connecticut 06520-8255
(203) 432-4940